IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN DOE, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. |
| | : | |
| v. | : | |
| | : | **JURY TRIAL DEMANDED** |
| CARNEGIE MELLON UNIVERSITY, | : | |
| | : | |
| Defendant. | : | |

<u>VERIFIED COMPLAINT</u>

Plaintiff, John Doe ("John"),[1] through the undersigned counsel, files this Complaint against Defendant Carnegie Mellon University ("CMU"), and in support thereof states as follows:

## I.  Parties

1.     John is a citizen of the Republic of India ("India") and temporarily resides in Pittsburgh, Pennsylvania, to attend CMU.  He is not admitted for permanent residence in the United States.

2.     CMU is a non-profit corporation, which is incorporated in the Commonwealth of Pennsylvania and has its principle place of business at 5000 Forbes Ave, Pittsburgh, PA 15213.  Upon information and belief, CMU is not incorporated in India.

---

[1] Upon the docketing of this Complaint, John is filing with this Court a Motion To Proceed Under Pseudonym.

## II.  Jurisdiction and Venue

3.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 due to diversity of citizenship and the amount in controversy exceeding $75,000.00.

4.     This Court also has federal question and supplemental jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

5.     This court has personal jurisdiction over CMU because it conducts business in the Commonwealth of Pennsylvania.

6.     Venue for this action properly lies in this district pursuant to U.S.C. § 1391 because CMU is located in this judicial district and all of the events or omissions giving rise to the claims asserted herein occurred in this district.

## III.  Factual Background

7.     John, a citizen of the India, attends CMU, is majoring in electrical and computer engineering and human-computer interaction, and is expected to graduate in May 2018.

8.     Raised by his mother and father in India, John speaks both English and Hindi. He applied and was accepted for admission to a number of prestigious schools in the United States of America and the United Kingdom. John chose to attend CMU for a multitude of reasons, including his desire to obtain a top-notch and incomparable education in the field of computer science and human-computer interaction and to participate in a vibrant arts community, which CMU possesses.

9.     On the evening September 17, 2016, and into the morning of September 18, 2016, John hosted a party at his apartment for a CMU student organization (the "Organization").

10.     Jane Doe ("Jane"),[2] who lives in the same apartment building as John and was at the time a member of the Organization, attended the party along with a number of other CMU students.

11.     Among other things, John and Jane consumed intoxicants and talked to each other at the party.

12.     During their conversations, Jane explained, among other things, that she was learning to play the guitar.

13.     John, who at that time had been playing the guitar for years, told Jane as much and asked if she would like to accompany him to his bedroom to play the guitar.

14.     Jane agreed, and together they went into John's bedroom and played guitar, neither one of them inebriated to such a degree that they could not control themselves or understand what was happening.

15.     Enjoying their interaction, John asked Jane if he could kiss her.

16.     Jane agreed, and they began kissing each other.

17.     Eventually, John removed Jane' shirt and bra, and they continued to kiss.

18.     John and Jane subsequently fell asleep in John's bed.

---

[2] See note 1, supra.

19.     Several hours later – in the early morning hours of September 18, 2016 – John and Jane awoke, and they began to engage in sexual activity, neither one of them intoxicated at this time.

20.     John moved his hand toward Jane's underwear, beneath her shorts; and Jane implied that she was menstruating and informed John he might not want to touch her genitals.

21.     John replied by assuring Jane that he was not bothered by her menstruation, and Jane indicated her comfort with John proceeding to touch her.

22.     Then, John asked Jane to perform oral sex on him.

23.     She agreed to do so and did.

24.     John then informed Jane that he would like to have intercourse.

25.     She replied by asking if he had any sexually transmitted infections.

26.     After John replied in the negative, Jane climbed on top of him, pulled down her shorts and underwear; and the two then engaged in sexual intercourse.

27.     John and Jane fell asleep afterwards.

28.     Hours later – i.e., at approximately 7:00 a.m. or 8:00 a.m. – John and Jane awoke.

29.     They then began a post-party cleanup of John's apartment with two other CMU students who had spent the night there.

30.     Thereafter, John and Jane left the apartment with the two other students and escorted them back to their residence.

4

31.    The group made the walk in pairs:  John and Jane walking side-by-side, and the two other students walking side-by-side.

32.    During the walk, John and Jane amicably chatted; it appeared as if Jane were John's girlfriend.

33.    After walking for approximately twenty minutes, the group arrived at the two other students' residence, and John and Jane then walked back to their apartment building together, an another approximate twenty minute walk.

34.    John and Jane entered their apartment building, and John escorted Jane to her apartment, to which he had never previously been, before returning to his own apartment.

35.    On September 19, 2016, John, having enjoyed the time he spent with Jane, sent her a text message asking if she would like to go to dinner with him.

36.    Receiving no response that day, John followed up with Jane on September 20, 2016, at which time Jane returned John's text message, telling him that she was not interested in getting together.

37.    Following that rejection, John did not pursue Jane or have contact with her except such incidental contact that would normally be expected of people living in the same apartment building and attending the same university.

38.    On February 22, 2017, Jane met with CMU's Deputy Title IX Coordinator, Jamie Edwards ("Jamie"), to discuss her September 17 and 18, 2016, encounter with John and to accuse John of sexually assaulting her during their interaction.

39.     Among other things, CMU's policies and procedures in place in February 2016 (the "Policies"), provided that a student commits a community standard violation if he sexually assaults another student.  See Exhibit A.

40.     The Policies further provide:

    a.  that sexual assault includes "any physical sexual act perpetrated against a person's will, where that person does not give clear and voluntary consent, or where that person is incapable of giving consent due to drug or alcohol use, or due to intellectual disability[,]" see id.;

    b.  that the procedures for handling complaints of sexual assault (i) are "to be fair, both in substance and in perception, to all persons concerned[;]" (ii) must ensure that "[a]ll persons concerned are . . . treated with respect and impartiality[;]" (iii) must further ensure that "both parties [receive] access to all charges, claims, and other relevant information that will be used at a[ny] disciplinary hearing, and [that] both parties . . . have an equal opportunity to present relevant witnesses and evidence[;]" and (iv) mandate that those persons "called upon to investigate allegations of sexual [assault] will be thoughtfully chosen and properly trained[,]"  id.; and

    c.  that "[e]very student has the constitutional rights and responsibilities of any citizen under the law[,]" id.

41.     At her initial meeting with Jamie on February 22, 2017, Jane stated, among other things:

    a.  that she arrived at John's apartment for the party very late in the evening and was also very sleep deprived at the time;

    b.  that John flirted with her and that she was friendly back to him;

    c.  that she consumed a lot of intoxicants and became very intoxicated;

    d.  that she was in the living room of John's apartment; sent a text message to a person she had a crush on (the "Crush"); took off her own shirt and eventually went into John's bedroom, where he was already in bed; and got into bed with John and then slept for approximately three hours;

6

e.  that, when she woke up, she was not intoxicated anymore, and that she and John began to be physically intimate;

f.  that she informed John that she was menstruating, and that he told her he did not mind;

g.  that John asked her to perform oral sex on him, which she did because (i) she thought it would be some sort of unspoken compromise to not having sex, (ii) she did not want John to kick her out of his bed, and (iii) she did not want to be unfriendly;

h.  that she told John that if he wanted to do something to her, he could ask;

i.  that John asked her to tell him what she wanted him to do to her;

j.  that she told him to decide because he had been doing a pretty good job thus far;

k.  that John asked her to get on top of him, which she did, and that John moved her underwear aside and began having sex with her;

l.  that she did not tell John she did not want to have sex;

m. that she had been black-out drunk before and had drunken hookups; that in those previous hookups, her partner would ask to have sex; that she had performed oral sex before meeting John, but done so willingly; and that John seemed very weird to her;

n.  that she and John walked two other partygoers home in the morning and then returned to their apartment building; and

o.  that Jane told a friend ("Jane's Friend") about the incident with John, but did not use the actual word "assault" in describing the interaction.

42.  On February 23, 2017, Jane emailed Jamie, informing her, among other things, that John had objectified her during their interaction by telling her that she was the hottest girl in the Organization.

43.     Jane emailed Jamie the following day to clarify that John told her she was "hot" before allegedly assaulting her.

44.     On March 2, 2017, Jamie emailed Jane, noting that Jane had supplemented her report to Jamie multiple times and that perhaps Jane should – though she was not required to – write a written narrative of her allegations.

45.     Via email, Jane declined to write a narrative of her version of events; explained that she believed she had thus far provided a full account of what happened; but wanted to be sure that Jamie knew (i) that on the night of John's party, she had been sleep deprived from days before, had consumed a lot of alcohol, was heavily menstruating, and was very physically weak and exhausted at the time of the "assault" and (ii) that she only performed oral sex on John at his request because she did not want to get kicked out of bed and because she thought it would be a compromise to having sex, which she not want to do.

46.     In her statements to Jamie, Jane never claimed, among other things, (i) that John threatened her or forced her to have oral or vaginal sex, (ii) that John ever threatened to kick her out of his bed, (iii) that she had verbally communicated to John that she did not want to have sex or that she believed oral sex was a compromise to the same, or (iv) that she and John had sat in a circle with other partygoers while John played his guitar.

47.     On March 22, 2017, Jamie asked John to meet with her, which he did that very day and without knowing exactly why Jamie wanted to meet.

48.     During John's March 22, 2017, meeting with Jamie, he told her the information set forth in paragraphs 9 through 37, above, which is markedly different than Jane's statements to Jamie.

49.     Jamie subsequently met with the two other students whom John and Jane had walked home the morning after the party.

50.     One of the students informed Jamie that she heard John and Jane having sex and noted that nothing about what she heard struck her as weird, that while John and Jane walked her home she thought Jane was John's girlfriend, and that she did not notice anything awkward between John and Jane.

51.     The other student told Jamie that she also heard John and Jane engaged in sexual activity, both in the night and morning, and that she heard Jane more than John.

52.     Other than the contents of paragraphs 38 and 41 through 51, above, Jamie conducted no further investigation before submitting a written summary of her interviews with Jane, John, and the other two CMU students to CMU's Office of Community Standards and Integrity ("OCSI") for further proceedings.

53.     Jamie, for example, (i) never asked Jane to identify who the Crush was or to provide a copy of the text message Jane claimed to have sent to her Crush or any other text messages Jane may have sent during the party and (ii) never interviewed the Crush to determine what information, if any, the Crush could provide.

54.     Jamie also never asked Jane to identify who Jane's Friend was and never interviewed Jane's Friend to determine how Jane had described her encounter with John and whether that description matched what she told Jamie.

55.     In receipt of Jamie's written summary of her investigation, OCSI permitted Jane to review the same and inquired whether Jane – after reviewing it – wanted to proceed with her sexual assault allegations against John.

56.     Jane wanted to proceed against John and – having at this time read John's description of what happened between the two of them – sent three emails to OCSI's Michelle Mirabella ("Michelle"), stating, among other things:

      a.    that John put her on top of him and that she had no physical strength;

      b.    that John immediately put his arms around Jane to pin her down against his body, pushed her legs apart with his hands while continuing to pin her down, and pulled aside her underwear to penetrate her while still pining her down (she never previously described the "assault" in this fashion);

      c.    that the intercourse lasted approximately ten seconds, was violent, and would have been painful for Jane but for the lubrication provided by her menstruation (Jane never before mentioned anything about violence in her encounter with John);

      d.    that John has a small part and smells bad (a retaliatory remark entirely irrelevant and never once previously mentioned by Jane); and

      e.    that the encounter was immediate, rough sex (despite her earlier, detailed description of her sexual activity with John).

57.     Jane further informed Michelle that she, among other things, wanted, John to be suspended from CMU for three semesters as a result of their interaction at his party.

58.     John appointed the undersigned as his advisor to assist him with the student conduct process, and he informed CMU of the same on April 5, 2017.

59.     Michelle subsequently (i) invited John to her office to review Jamie's written report and part of the emails Jane sent to Michelle containing the content set forth in paragraphs 56-57 and (ii) suggested that John use a CMU employee as his advisor.

60.     John attended that meeting with the undersigned and reviewed Jamie's written summary of the investigation and those portions of Jane's emails to Michelle that were provided to him; and he was also informed by Michelle that Jane asked that John be suspended from CMU for three semesters, an outcome John could accept to avoid any further proceedings against him.

61.     John did not agree to the suspension.

62.     In a subsequent meeting with Michelle, John was informed that Jane had changed her mind regarding her requested punishment:  she was seeking expulsion, not suspension.

63.     Through the undersigned, John sent the letter attached hereto as Exhibit B, in which John raised a number of concerns with CMU, including (i) that the university had not independently evaluated Jane's allegations to determine whether or not a student conduct process against John was warranted based on the facts *Jane* had alleged; (ii) that CMU declined to perform such an evaluation, noting that it was required to provide Jane with a "voice" and to proceed against John

pursuant to her wishes; and (iii) that the university was not treating John fairly, as required by law and the Policies.  See Exhibit B.

64.    John also informed Michelle that he would not agree to expulsion.

65.    CMU then began the process of holding a disciplinary hearing against John and also responded to the undersigned's letter.  See Exhibit C; see also Exhibit D (John's reply to CMU's response).

66.    CMU's Polices state the following, among other things, regarding the disciplinary hearing process:

    a.  the accused "must be notified in writing of the specific policy, standard or regulation the student has allegedly violated" and such notification "is normally made at least seven calendar days before the hearing[;]"

    b.  "[t]hroughout the student conduct process, the [accused] will receive full notification of complaint, notification of any hearing and notification of disposition of the charge and will have the right to be present throughout the hearing process[;]"

    c.  the individuals tasked with determining whether the accused has violated one of CMU's policies (the "Board") – composed of two CMU students and three CMU employees – "will be provided a pre-read packet, which may include, among other relevant items:  the initial complainant report; any investigation reports and/or witness statements; a statement from the complainant(s) to the [B]oard; and a statement from the [accused] to the [B]oard[;]"

    d.  the accused may make counter-allegations against the accuser, but the same "cannot be based solely on the fact that a complaint was brought forward[, and t]he associate dean of student affairs responsible for community standards will determine if the counter-allegations will be heard by the [same Board hearing the complaint against the accused] or resolved in a subsequent hearing[;]"

    e.  both the complainant and the accused may have one person appear at the disciplinary hearing as his or her advisor; where the advisor is an attorney, CMU may elect to have one of its attorneys present

at the disciplinary hearing; and in no event will legal counsel "be permitted to participate in the proceedings[;]"

f.  the complainant and accused may submit a list of potential witnesses to the Board, but the Board in its sole discretion determines whether any witnesses, and which ones, will be called to testify at the disciplinary hearing;

g.  the disciplinary hearing will be recorded, but not the deliberations of the Board;

h.  "[a] preponderance of the evidence standard (more likely than not) will be used to determine if a university policy, standard or regulation was violated[;]"

i.  if the Board determines that the accused has violated a policy, the Board will make a recommendation as to what penalty it believes to be appropriate;

j.  OCSI will notify "the associate dean of student affairs responsible for community standards in writing of the recommendation of the [Board] regarding responsibility and any sanctions deemed appropriate[;]"

k.  "[a]fter reviewing the [Board's] recommendations, the associate dean of student affairs responsible for community standards or designee will notify the [accused] ***of the final decision***[;]"

l.  in cases involving allegations of sexual assault, the "***victim*** will receive notification of disposition of the charges as appropriate" and that "***victim*** has the right to submit an appeal following notification of the disposition of a complaint[;]"

m.  the accused also has a right to submit an appeal;

n.  the appeal officer, in receipt of an appeal and if certain cause exists, "has the authority to modify the decision as they deem appropriate for resolution of the matter being appealed, which could entail an increase, decrease or change to the nature of the sanction(s)[;]" and

o.  that information disclosed during a disciplinary hearing should remain confidential and that the parties (i) are to keep confidential the materials provided to them prior to the disciplinary hearing, (ii)

> may not share those materials without permission from CMU, (iii) may not duplicate those materials or use them for any purpose other than the disciplinary hearing (collectively, the "Confidentiality Policies").

<u>See</u> Exhibit A (emphasis added).

67. In addition, CMU did not – and still does not – permit parties to a disciplinary hearing to directly question any witnesses or party; rather, those parties were and are required to submit questions to the Board, which may – but need not – ask those questions to the witnesses or parties at its sole discretion.

68. CMU also (i) required the accused and accuser to submit their optional pre-hearing statement and any information not already contained in the record maintained by OCSI to the Board no less than 72 hours before a disciplinary hearing; (ii) permitted the accused or accuser to bring additional evidence to the disciplinary hearing itself provided that enough copies of the evidence were brought to ensure all Board members and hearing participants had a copy; and (iii) the Board – if the accused or accuser brought new evidence to the hearing and sufficient copies of the same – could, in its discretion, admit the evidence or not.

69. CMU scheduled John's disciplinary hearing for July 12, 2017.

70. John submitted a timely pre-hearing statement, letters of support, and witness list; Jane did not submit letters of support or a timely pre-hearing statement.

71.     John also submitted information regarding his immigration status to OCSI on July 11 2017, and brought sufficient copies of that information to the disciplinary hearing to ensure all appropriate individuals had a copy.

72.     At the commencement of the July 12, 2017, disciplinary hearing (the "First Hearing"), Jane submitted to the First Hearing's Board ("First Board") and provided copies to all relevant individuals a nine-page, single spaced, written pre-hearing statement that was both untimely and prepared after Jane had an opportunity to read and digest John's pre-hearing statement, which she had received before the First Hearing.  John had no advance notice of Jane's pre-hearing statement or much of its contents.

73.     Among other things, Jane's pre-hearing statement (the "Untimely Pre-Hearing Statement") contained the following allegations that were entirely new or inconsistent with the information Jane provided to Jamie or Michelle:

> a.  that Jane and John, along with other partygoers, sat in a circle on the floor while John had his guitar and possibly played it in preparation for sexually assaulting Jane (this was an entirely new allegation);
>
> b.  that Jane told John that she was extremely drunk (this was also a new allegation);
>
> c.  that John removed his clothing, exposed himself to Jane, and repeatedly stated, "Let's fuck" (another new allegation);
>
> d.  that Jane performed oral sex on John for only one or two seconds and did so because John held a higher position than her in the Organization (Jane had never previously claimed the oral sex was so incredulously short or done due to John's position in the Organization);

    e.   that Jane had only ever had one previous "drunken hookup" and that such occurred while she was heavily menstruating and did not result in sex (this allegation was contrary to Jane's previous statement that she had had "drunken hookups" and contained new information to conveniently contrast John's conduct towards her – sex after being told she was menstruating – with another individual's conduct – no sex after hearing Jane was menstruating – and to demonstrate that telling a man that she was menstruating meant that Jane did not want to have sex with him); and

    f.   that John had "bloodily raped" her (another new allegation").

74.    Not only did the First Board permit Jane to enter the Untimely Pre-Hearing Statement into the record at the First Hearing, it also, among other things:

    a.   permitted Jane, while the First Hearing was on-going, to submit into evidence one text message she (i) incredulously claimed to have only found during First Hearing itself, (ii) claimed to have sent to a friend around 3:00 a.m. in the morning of the party explaining that she was drunk, (iii) and of which she had no copies to submit to the First Board or John for review;

    b.   permitted Jane to refer to another text message she (i) incredulously claimed to have only found during the First Hearing itself; (ii) claimed to have sent to the Crush at around 3:00 a.m. in the morning of the party; and (iii) of which she had no copies to submit to the First Board or John for review;

    c.   never permitted John to see either of the text messages noted above;

    d.   permitted Jane, for the first time, to state that the alleged sexual assault occurred at approximately 7:00 a.m.;

    e.   refused to call all witnesses identified by John as relevant to the First Hearing;

    f.   permitted CMU's attorney, who attended the First Hearing, to participate in the same by making statements and proposing that the First Board ask certain questions;

g. declined to ask Jane a number of questions proposed by John designed to demonstrate her lack of credibility, such as (i) why, if Jane was so sleep deprived and physically unable to move during the alleged assault, did she immediately thereafter walk with John (the man she says had just raped her) and the two other students to the latter's residence and then walk back with John (her alleged rapist) to the apartment building they shared, a walk of approximately forty total minutes, instead of going immediately to her own apartment; (ii) why did Jane arrive at the party so late if she were so incredibly sleep deprived; (iii) why was she unable to move during the alleged assault; (iv) why did she alter certain of her previous statements or make new allegations throughout the student conduct process against John (v) how precisely were she and John physically positioned when the alleged assault occurred; and

h. asked questions in a way that revealed that members of the First Board – the group tasked with determining whether a sexual assault occurred – accepted from the First Hearing's outset that Jane was credible and that a sexual assault had occurred (for example, First Board members asked questions to both John and Jane about whether certain circumstances existed when the "assault" occurred, showing an acceptance that an assault actually took place before the First Board had heard the entirety of the evidence at the First Hearing).

75. On July 14, 2017, John, through the undersigned, sent a letter to CMU raising a number of concerns about the First Hearing, arguing that several of the Polices – and John's due process rights – had been violated. A copy of that letter is attached hereto as Exhibit E and is incorporated fully herein. See Exhibit E.

76. CMU's Acting Associate Dean of Student Affairs, John Hannon ("Hannon") – after reviewing the record of the First Hearing and interviewing the First Board; the moderator; and Michelle, who served as CMU's "process advisor" at the First Hearing – informed John in a letter dated July 24, 2017, that "there were procedural errors in the hearing process, including, most notably, the introduction

of new evidence without sufficient opportunity for the hearing participants and the [First B]oard members to review, evaluate, and respond to it."

77.   Hannon further stated that he was "remanding th[e] matter" for a second disciplinary hearing comprised of new board members.

78.   By letter dated July 28, 2017, John, through the undersigned, explained to CMU that it was his understanding – based on conversations with the university – that CMU was "considering how to proceed [against him], as there [were] no written policies and procedures in place governing" the circumstances then presented, i.e., where no final decision was rendered following the First Hearing, despite the Policies' requirement that a final decision be made.  See Exhibit F.

79.   In the July 28, 2017, letter, John argued to CMU that it must stop the proceedings against him because a remand from the First Hearing and the holding of a second disciplinary hearing were not permitted or authorized by any CMU policy or procedure.  Id.

80.   John further stated in the July 28, 2017, letter that if CMU wrongly concluded that it could continue to proceed against him, the university should first conduct an investigation into the new allegations Jane made at the First Hearing, such as (i) attempting to locate witnesses who could speak about the existence of a "guitar circle" and (ii) evaluating the text messages Jane claimed to have sent to determine who received them and if they were altered in any way.  Id.

81.   John received no formal response to the July 28, 2017, letter.

82.     However, in an August 18, 2017, meeting with OCSI, Michelle informed John, among other things, that CMU was, indeed, not consulting any written polices or procedures to guide the proceedings after Hannon's remand of the First Hearing because the circumstances occurring were unprecedented.  See Exhibit G (email from the undersigned to Michelle confirming the August 18, 2017, conversation).

83.     In September 2017, OCSI informed John that Jamie would be investigating certain matters raised at the First Hearing that had either never before been investigated or warranted further inquiry.

84.     Indeed, Jamie identified the following as matters to investigate:

    a.   whether John played his guitar with only Jane present, or with others present as well;

    b.   what was the approximate timeline and sequencing of the sexual interaction between John and Jane;

    c.   at the time of intercourse, how were Jane and John positioned;

    d.   was Jane wearing underwear and/or shorts at the time of intercourse, and if not, who removed them;

    e.   did John's roommate have any pertinent information;

    f.   how many times did Jane discuss menstruating with John;

    g.   when did Jane observe and comment on menstrual blood on the sheets;

    h.   when did John and Jane discuss sexually transmitted infections; and

     i.   who did Jane text while in John's apartment, and were those texts available for purposes of assessing timeline, levels of intoxication, and the credibility of Jane and John.

85.    Despite herself identifying the above issues as warranting further inquiry or investigation, Jamie and CMU's Office of Title IX Initiatives only investigated issues (a), i.e., the "guitar circle;" (e), i.e., information possibly possessed by John's roommate; and (i) text messages in Jane's possession.  She declined to make inquiry into the other issues because – she claimed – they dealt with John's and Jane's credibility, she wanted to minimize the number of times the parties were required to speak about the incident, and those matters of credibility could be inquired into at the second disciplinary hearing.

86.    Notably, John had made well known to CMU after the First Hearing that he was comfortable undergoing further scrutiny and investigation.  See Exhibit F.

87.    John and Jane eventually provided Jamie with the names of individuals who could speak to the "guitar circle."  Those individuals – and one other – were interviewed, and none of them recalled there being a "guitar circle" at the party, not even the individuals identified by Jane.

88.    Jamie also asked Jane to provide text messages she sent or received between 10:00 p.m. on September 17, 2016, and 9:00 a.m. on September 18, 2016, including messages to the Crush.

89.    Jane provided one set of messages purportedly demonstrating that she arrived at John's party shortly after midnight.

90.      Jane also sent Jamie screenshots of messages between herself and the Crush, whose name and image she redacted.  The time-stamp was not visible on the screenshots for the first three messages, but was visible for two of the messages purportedly sent at approximately at 3:00 a.m. on September 18, 2016, and 7:35 a.m. on the same date.  Notably, Jamie never followed up with Jane about the identity of the Crush and Jane's redaction of the same from the messages, even though – as set forth above – Jamie (i) had previously identified these text messages as pertinent to Jane's credibility and (ii) could have interviewed the Crush to confirm the accuracy of the messages Jane provided.  In addition, in transmitting these particular messages to Jamie, Jane revealed that after the First Hearing but before Hannon's decision to remand, Hannon and Michelle had requested these messages; accordingly, communications and interactions between CMU and Jane regarding evidence from the First Hearing occurred that John was not informed of or included in at the time.

91.      Also sent to Jamie by Jane were two screenshots of messages purportedly between Jane and an individual for whom Jane only provided a first name.  The date and time stamp of the first message is not visible, but there exists date and time stamps for the other messages.  Again, Jamie did not attempt to obtain the full identify of the person communicating with Jane in these messages or to interview this person to determine the accuracy of the messages provided.  Notably, in these messages Jane apparently tells the recipient between 7:15 a.m. and 8:25 a.m. on September 18, 2016, that ***she*** "fucked up again[;]" she also never

mentions anything about an assault or rape that, if Jane is to be believed, would have occurred just before this "conversation" began.

92.    By October 26, 2017, Jamie had completed her supplemental "investigation" and provided the same for OCSI.

93.    On November 15, 2017, John, through the undersigned, emailed Michelle for, among other things, an update on the status of the complaint against him.

94.    Michelle met with John and the undersigned on November 20, 2017, and in that meeting explained, among other things, that she could not accurately predict whether a second disciplinary hearing would be initiated against John before the end of the 2017 calendar year.

95.    The following day, however, Michelle emailed John requesting his availability for a second disciplinary hearing on December 5, 6, or 7, 2017, a period of time CMU dedicates to final projects and students use to prepare for final exams.

96.    Through the undersigned, John informed Michelle that he was available for a second disciplinary hearing on December 5, 6, and 7, 2017, and that the undersigned was not available on December 6 and 7, 2017.

97.    At approximately 5:30 p.m. on November 22, 2017, i.e., the evening before Thanksgiving 2017, Michelle informed John and the undersigned that the second disciplinary hearing would occur on December 6, 2017, even though the undersigned was unavailable.  See Exhibits H & I.  According to Michelle, the undersigned's unavailability was immaterial as John could simply appoint someone

22

else to be his advisor.  Exhibit I.  Upon information and belief, Jane's advisor was known to be available on December 6, 2017.

98.    Also at approximately 5:30 pm. on November 22, 2017, Michelle made available to John the written summary of Jamie's supplemental "investigation" and the exhibits attached thereto.  Those items – along with a "transcript" from the First Hearing (the "Transcript") – were to and will be included among the materials provided to the individuals tasked to hear (the "Second Board") the second disciplinary hearing (the "Second Hearing") and make a recommendation thereafter regarding liability and sanction(s).

99.    Notably, the Transcript lists John as "inaudible" a great number of times, depriving the Second Board of the comments, questions, and answers he gave to the First Board.  That is not the case, however, with Jane's comments, questions, and answers in the Transcript.

100.    John was not inaudible at the First Hearing.  He spoke clearly and loudly.

101.    In addition, the materials to be submitted to the Second Board contained a memorandum memorializing an interview with John's roommate. Therein, John's roommate purportedly informed a university investigator that John commonly had parties involving intoxicants and that he – i.e., the roommate – was uncomfortable with, among other things, the amount of alcohol consumed in the apartment.  Notably, John's roommate informed CMU's investigator that he did not remember anything like a "guitar circle" ever occurring; and the material to be

submitted to the Second Board contains no similar investigation into Jane's history or habit of consuming intoxicants.

102.    Also included in the materials to be submitted to the Second Board was an email exchange between Jane, her advisor, and Jamie, wherein Jane – on October 12, 2017 – revealed that John had filed a lawsuit (the "State Lawsuit") against her and that she believed he was retaliating against her.

103.    In said email exchange, Jamie requests that she, Jane, Michelle, and Jane's advisor find a time to meet "at once" to discuss the State Lawsuit, making it appear as if the University (and Jamie herself) had no knowledge that legal action against Jane had been filed.

104.    That, however, was not the case.  John, through the undersigned, informed CMU in August 2017, that he was contemplating filing a writ of summons against Jane in state court for defamation.  See Exhibit J.  In September 2017, moreover, John, again through the undersigned, had another discussion with CMU about filing a writ of summons as the one-year anniversary of the September 17 and 18, 2016, party was approaching and defamation, under Pennsylvania law, has a one-year statute of limitations.  See Exhibit K.  Also in September 2017, CMU informed John that he should take whatever legal steps were necessary to preserve his rights; and John – still in September 2017 – initiated the State Lawsuit against Jane by writ of summons and informed CMU of the same.  See id.  Moreover, in an October 3, 2017, meeting with Jamie, John and the undersigned discussed with her

the existence of the State Lawsuit; and in that conversation, Jamie made clear that she was already aware that legal proceedings had been filed against Jane.

105.   Notably, John – through the writ of summons – did not disclose the nature of the State Lawsuit against Jane.  See Exhibit S.  He also moved the state court to seal the record or to amend the caption to John Doe v. Jane Roe to protect the privacy of the parties involved; and in so moving disclosed only that Jane had accused him of sexual assault, but provided no information about CMU or any other university, no information about any disciplinary proceedings, and no information (other than the parties' names) to link the parties to the State Lawsuit to particular individuals attending CMU.  See Exhibit C.

106.   Jane, however, through her legal counsel, filed a motion in the State Lawsuit, among other things, linking the parties to CMU, disclosing the existence of a student conduct process against John, explaining that there had been an initial investigation by CMU into Jane's allegations of sexual assault, revealing the happening of the First Hearing, noting that that a Second Hearing was to occur, and stating that further investigation by CMU was ongoing.  See Exhibit M.

107.   On November 24, 2017, John requested that Michelle initiate a student conduct process against Jane for lies she told at the First Hearing, including that he sexually assaulted and raped her and that a "guitar circle" occurred.  John also asked that CMU include counter-allegations against Jane in the Second Hearing for lies she told at the First Hearing about the sexual assault and rape, as well as the "guitar circle."

108.    In a November 28, 2017, meeting with John and the undersigned, Michelle informed John that Hannon would not permit John to bring counter-allegations against Jane at the Second Hearing and that any student conduct process against Jane would occur after the Second Hearing.

109.    During that November 28, 2017, meeting, Michelle also informed John (i) that any supplements to the record for the Second Hearing must be received by November 30, 2017, at 9:00 a.m.; (ii) that no additional information could be submitted to the Second Board on the day of the Second Hearing; (iii) that the Second Hearing would have the same moderator, process advisor, and CMU attorney as the First Hearing; and (iv) the same policies/procedures used at the First Hearing – other than the change precluding the admission of new material on the day of the hearing – would be used at the Second Hearing.

110.    By letter dated November 29, 2017, John, through the undersigned, again objected to the holding of the Second Hearing as being unauthorized by CMU's policies and procedures.  See Exhibit N.  John also set forth additional reasons the Second Hearing should not occur.  Id.  The letter ended with a request to CMU that it not hold the Second Hearing.  Id.

111.    John submitted timely supplementary material for the Second Board's consideration on November 30, 2017.

112.    On December 1, 2017, counsel for CMU informed John, through the undersigned, that it was rejecting his request to not hold the Second Hearing.  See Exhibit O.  In so doing, CMU acknowledged that its "written policies do not address

26

rehearing specifically, [but] it is inherent in the authority of the Associate Dean to remand disciplinary matters for rehearing where he deems appropriate." Id. CMU cited no provision of its policies in support of the Associate Dean's inherent authority. In addition, following the First Hearing and John's letter of July 28, 2017, see Exhibit F, wherein he objected to holding a second disciplinary hearing because the same was not authorized by CMU policy, CMU changed its policies (the "New Policies") to now permit a remand following an appeal of a disciplinary hearing's results. See Exhibit P.

113. Also on December 1, 2017, John received from OCSI Jane's supplementary material for the Second Board. Included therein, was another pre-hearing statement, which again altered Jane's previous version of events.

## IV. Causes of Action

### A. Count I – Violation of Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681, et seq.)

114. Paragraphs 1 through 113 are incorporated as if fully set forth herein.

115. Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681-88, provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance." 20 U.S.C. § 1681(a).

116. CMU is a recipient of federal funding and, therefore, is subject to Title IX and all of its regulations.

117.   Pursuant to Title IX, educational institutions are required to adopt and publish grievance procedures providing for the prompt and equitable resolution of student complaints alleging any action which would be prohibited by Title IX and its regulations.

118.   In 2011 and 2017, the United States Department of Education's Office of Civil Rights issued guidance related to how Title IX was and is to be applied.  See Exhibits Q & R.

119.   CMU's procedures and actions prior to the First Hearing, including CMU's investigation into Jane's allegations, and actions during the First Hearing treated John unfairly because of his sex.  See ¶¶ 38-74.

120.   CMU's conduct following the First Hearing also treated John unfairly because of his sex.  See ¶¶ 76-113.

121.   CMU has been clearly biased against John, as a male, and in favor of Jane, his female accuser.

122.   At all relevant times CMU was on notice of its various violations of Title IX and its bias against John.

123.   CMU violated its own procedures and failed to adhere to Title IX requirements for an equitable and prompt process.

124.   CMU failed to provide adequate training to its employees to carry out a prompt and equitable disciplinary student conduct process.

125.   CMU failed to provide adequate training to the First Board as well as the moderator and process advisor at the First Hearing to ensure an equitable disciplinary hearing process.

126.   The remand for the Second Hearing is (i) not authorized by CMU's own policies; (ii) inequitable because virtually all of the procedural errors were caused by CMU, including its deference to Jane and Jane's own violations of procedure and policy; and (iii) defies the very definition of "prompt," as these allegations were first brought to light almost one year ago.

127.   CMU discriminated against John based upon his gender, in direct contravention of Title IX.

128.   CMU's violations of Title IX have necessitated, among other things, that John hire counsel to defend against CMU's misconduct during the student conduct process, causing economic damages and loss to John.

129.   As a result of the foregoing, John is entitled to damages in an amount to be determined at trial, plus prejudgment interest and attorney's fees and costs.

WHEREFORE, Plaintiff John Doe demands that judgment be entered in his favor and against Carnegie Mellon University for compensatory damages in excess of $75,000.00 in addition to prejudgment interest; attorney's fees; expenses; costs; injunctive relief enjoining CMU from holding the Second Hearing; and other relief this Court deems to be appropriate.

B.   **Count II – Request For Declaratory Relief Regarding Violations Of Title IX Of The Education Amendments Of 1972 (20 U.S.C. § 1681, et seq.)**

145.   Paragraphs 1 through 144 are incorporated as if fully set forth herein.

146.   As demonstrated herein, CMU has discriminated against John in violation of Title IX because of his gender, and it is apparent that CMU will continue to discriminate against John at the Second Hearing if it is permitted to occur.

147.   Indeed, because CMU will follow the same procedures at the Second Hearing that it used at the First Hearing; use the same moderator, process advisor, and attorney at the Second Hearing as were used in the First Hearing; has not, upon information and belief, retrained or properly trained the members of the Second Board and not provided the Second Board with an appropriate investigation into Jane's allegations, it is certain that John will be discriminated against during the Second Hearing.

148.   As a student at CMU, John has a tangible interest in requiring CMU to abide by Title IX and to carry out its disciplinary process in a lawful manner.

149.   Unless CMU is enjoined from its unlawful activity, John will suffer – as a result of the Title IX violations that will occur at the Second Hearing – irreparable harm, including, but not limited to, expulsion from CMU; loss of the ability to receive an education and degree from CMU; and the loss of earning and employment opportunities flowing to those graduating from CMU in John's fields of

study, opportunities that are incomparable to those available to graduates from other colleges and universities.

150.    A judicial declaration thus must be issued that holds and makes clear that CMU (i), by having the Second Hearing, will violate John's Title IX rights and (ii) cannot, therefore, conduct the Second Hearing or continue disciplinary proceedings against John based on Jane's allegations of sexual assault/rape or initiate proceedings against him for any purported violation of the Confidentiality Policies, which would penalize John for seeking to obtain legal relief to protect his rights as well as chill others similarly situated – i.e., male students being discriminated against by CMU – from doing the same.

151.    John and CMU have adverse legal interests.

152.    Entering the declaratory relief requested herein will redress a real and substantial controversy between John and CMU.

153.    Entering the declaratory relief requested herein will also be useful to John and others being similarly treated by CMU.

WHEREFORE, Plaintiff John Doe demands that judgment be entered in his favor and against Defendant Carnegie Mellon University for declaratory and injunctive relief, finding that CMU will – by holding the Second Hearing – violate the rights afforded to John and protected by Title IX and, therefore, cannot hold the Second Hearing or further proceed against John based on Jane's allegations of sexual assault/rape or proceed against him for purported violations of the Confidentiality Policies.

## C.     Count III – Breach Of Contract

154.    Paragraphs 1 through 153 of this Complaint are incorporated, as if fully set forth herein.

155.    John's acceptance of admission and payment of tuition and fees to CMU created a contract between John and CMU, the terms of which are contained in CMU's written policies and procedures, some of which have been attached hereto. See Exhibits A & P.

156.    CMU breached its contract with John by violating its procedures in the following ways:

a. failing to be fair in both substance and perception, to John in the handling of Jane's allegations of sexual assault (i) by failing to adequately investigate Jane's allegations, statements, and conduct; (ii) by permitting Jane to repeatedly change and modify her version of events; (iii) by suggesting that John use a university employee as his advisor after John had appointed the undersigned to said position; (iv) by failing to independently evaluate Jane's initial allegations regarding the alleged assault to determine if those allegations set forth facts upon which an assault could be found and, therefore, actually justified the holding of a disciplinary hearing; (v)  by not permitting John or his attorney to cross-examining witnesses and Jane at the First Hearing; (vi) by not permitting John to call all of his proposed witnesses at the First Hearing; (vii) by not training the First Board as well as the First Hearing's moderator and process advisor in such a way to ensure they were not biased against John and in favor of Jane; (viii) by not permitting John to ask Jane all of his questions designed to attack her credibility at the First Hearing; (ix) by not training the First Board to be able to identify the propriety of many of John's proposed questions to Jane; (x) by having written policies that expressly state an individual bringing allegations of sexual assault is a "victim" before any hearing to determine said status has occurred; (xi) by scheduling the Second Hearing for a day when John's advisor was not available and during a time when CMU students are working on final projects and preparing for final exams; (xii) by providing the Second Board the Transcript, which

lists John as repeatedly inaudible (when he was not) to deprive the Second Board of all of John's statements at the First Hearing and which exposes the Second Board to a record CMU itself has determined was derived by procedural error requiring a remand for the Second Hearing; (xiii) by not permitting John to bring counter-allegations against Jane at the Second Hearing; and (xiv) by including the Confidentiality Polices in its contract with John and thereby attempting to deprive John of his ability to ever proceed to court and seek relief based upon information stated during a disciplinary hearing or provided to a Board prior to the same.

b.  failing to render a final decision after the First Hearing, as required,  and remanding for the holding of the Second Hearing, which is not authorized or permitted by CMU's policies;

c.  permitting Jane to, among other things, wrongly admit the Untimely Pre-Hearing Statement at the First Hearing;; (ii) wrongly admit a text message at the First Hearing; and (iii) wrongly refer to another text message at the First Hearing; and

d.  permitting CMU's attorney to participate in the First Hearing.

157.    As a direct and foreseeable consequence of the foregoing contractual breaches, John suffered nominal damages or compensatory damages in excess of $75,000.00 pertaining to the cost of hiring an attorney to advise him throughout all of CMU's contractual breaches.

WHEREFORE, Plaintiff John Doe demands that judgment be entered in his favor and against Defendant Carnegie Mellon University for nominal and/or compensatory damages in addition to prejudgment interest; injunctive relief precluding CMU from holding the Second Hearing, further proceeding with a student conduct process against John based on Jane's allegations of sexual assault/rape and proceeding against John for purported violations of the

33

Confidentiality Policies; and other relief that this Court may deem to be appropriate and warranted.

### D.  Count IV – Specific Performance

158.   Paragraphs 1 through 157 above are incorporated as if fully set forth herein.

159.   As a private university, CMU's contract with John includes, among other things, all of the written policies and procedures presented to him as a student, including those set forth in Exhibits A and P.

160.   By permitting the student conduct process against John to proceed after the First Hearing and mandating the occurrence of the Second Hearing, CMU has breached its contract with John as the same does not authorize those actions.

161.   In addition, if John is subjected to the Second Hearing, he will be expelled from CMU as CMU has demonstrated it will not treat John fairly, but will instead be biased in favor of Jane to John's detriment.

162.   CMU's breaches of contract set forth in the preceding two paragraphs leave John without an adequate remedy at law.

163.   Accordingly, CMU must (i) be required to adhere to the terms of its contract, which do not authorize proceeding against John after the First Hearing or holding the Second Hearing, and (ii) thus be prevented from both continuing the disciplinary process initiated by Jane against John and holding the Second Hearing.

164.   It is not an undue hardship upon CMU to specifically perform its contract with John as set forth in the preceding paragraph because John is only

here requesting that CMU be required to adhere to the terms of its contract with him and to treat him fairly and without bias.

165.    John has fully performed his obligations under the terms of his contract with CMU by, among other things, continuing to pay tuition and other fees/expenses.

WHEREFORE, Plaintiff John Doe demands that judgment be entered in his favor and against Defendant Carnegie Mellon University for specific performance and that Defendant Carnegie Mellon be precluded from further proceeding against John on the basis of Jane's allegations of sexual assault/rape and from holding the Second Hearing.

### E.    Count V – Request For Declaratory Relief For Due Process Violations

166.    Paragraphs 1 through 165 are incorporated as if fully set forth herein.

167.    In its contract with John, CMU expressly extended to him all of "constitutional rights" of citizens.

168.    As such, the rights provided for by the United States Constitution are applicable to the disciplinary process at issue here.

169.    John has a protected liberty interest in his good name, reputation, and integrity, of which he cannot be deprived without due process.

170.    John has a protected interest in pursuing his education and future employment, of which he cannot be deprived without due process.

171.    John has a property interest in his education and continued enrollment at CMU, of which he cannot be deprived without due process.

172.    Due process protections are required in the disciplinary process at issue here.

173.    By (i) failing to adequately investigate Jane's allegations against John; (ii) failing to permit John or his attorney to cross-examine Jane; (iii) failing to permit John to call witnesses of his choosing; (iv) failing to provide John with an adequately trained Second Board that will allow John to present a sufficient number of questions to challenge Jane's credibility; (v) failing to provide John with a Second Board that will not be biased against him; and (vi) failing to provide John with a Second Board that will not automatically accept Jane as credible and that she was sexually assaulted/raped before the Second Hearing has begun, CMU will deprive John at the Second Hearing of his rights to notice of the charges/allegations against him, an opportunity to be heard on the same, and/or the ability to defend himself.

174.    In addition, by having the Confidentiality Policies, CMU attempts to prevent John from seeking redress for any unlawful actions CMU has or will commit – like those set forth above – that require John's disclosure of the content of the First Hearing and the materials provided to the First Board and Second Board.

175.    John and CMU have adverse legal interests.

176.    Entering the declaratory relief requested herein will redress a real and substantial controversy between John and CMU.

177.    Entering the declaratory relief requested herein will also be useful to John and others being similarly treated by CMU.

WHEREFORE, Plaintiff John Doe demands that judgment be entered in his favor and against Defendant Carnegie Mellon University for declaratory and injunctive relief, finding that CMU (i) will – by holding the Second Hearing – violate John's constitutional rights to due process and, therefore, cannot hold the Second Hearing and (ii) cannot proceed against John for any purported violation of the Confidentiality Policies.

Respectfully submitted,


*/s/ Timothy J. Lyon*
Timothy J. Lyon
Pa. ID No. 200439
525 William Penn Place, 28th Floor
Pittsburgh, PA  15219
(412) 261-1600
(412) 227-5551 (facsimile)
tlyon@leechtishman.com

<u>VERIFICATION</u>

I, ███████████, hereby affirm under the penalties of perjury, as follows:

1.  I am over the age of 18 and otherwise competent to testify.

2.  The factual allegations in the foregoing Verified Complaint are, to the best of
    my knowledge and belief, true and accurate.



_3ʳᵈ Dec, 2017_
Date

───────────────

[1] Plaintiff's name has been redacted to protect his confidentiality and privacy interests. As the court will note, Plaintiff is also filing, as soon as practicably possible, a Motion to Proceed under the Pseudonym John Doe. Notwithstanding the foregoing, this Verification, without redaction and disclosing Plaintiff's full identity to the court, is available for submission to the court in a manner that protects Plaintiff's identity from public disclosure.